UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

S.B. and K.B., individually and on behalf of
K.B.,

                              Plaintiffs-Appellants,

                    -against-

GOSHEN CENTRAL SCHOOL DISTRICT,

                              Defendant-Appellee.

**MEMORANDUM OPINION
AND ORDER**

20-CV-09167 (PMH)

PHILIP M. HALPERN, United States District Judge:

Plaintiffs S.B. and K.B. (collectively, "Plaintiffs") bring this action, individually and on

behalf of their minor daughter, K.B., against Goshen Central School District ("Defendant" or the

"District"), under: (i) the Individuals with Disabilities Education Act ("IDEA"), 20 U.S.C. §§ 1400

*et seq.*; (ii) New York Education Law § 4402; and (iii) Section 504 of the Rehabilitation Act of

1973 ("Section 504"), 29 U.S.C. § 794.[1] (Doc. 1, "Compl."). Plaintiffs seek judicial review of a

decision by a State Review Officer ("SRO") at the New York State Education Department which

found that: (i) Defendant provided K.B. with a free appropriate public education ("FAPE"); and

(ii) Plaintiffs were not entitled to private placement reimbursement. Plaintiffs seek reversal of that

decision, reimbursement for the costs of placing K.B. in private school for the 2018-2019 school

year, expert costs, attorneys' fees, and declaratory relief. Before the Court is Plaintiffs' motion for

summary judgment, and Defendant's cross-motion for summary judgment. (Doc. 10-1, "56.1";

Doc. 20; Doc. 20-1, "Pl. Br."; Doc. 21; Doc. 22, "Def. Br."; Doc. 23, "Pl. Opp."; Doc. 27, "Def.

Reply").

---

[1] The preliminary statement of the Complaint also states that the action is brought under Title II of the
Americans with Disabilities Act ("ADA"), 42 U.S.C. § 12131 *et seq.*, and the Fourteenth Amendment, but
Plaintiffs did not set forth in the Complaint any claims for relief under either the ADA or 42 U.S.C. § 1983.
(*See generally*, Compl.).

For the reasons set forth below, Defendant's motion for summary judgment is GRANTED and Plaintiffs' motion is DENIED.

## BACKGROUND

I.    <u>K.B.'s Condition and Educational History</u>

K.B., who was a student in the District's schools from kindergarten through seventh grade, was diagnosed by various professionals in connection with mental and psychological conditions during the relevant time period. Despite these diagnoses—as discussed more fully *infra*—K.B.'s academic record remained largely within the average or above average range, her standardized test results remained largely within the average or above average range, and she received both public and private accommodations over the years that led to varying levels of success. These topics, as relevant to the Court's analysis, are discussed *seriatim*.

A.    <u>K.B.'s Clinical Diagnoses</u>

K.B.'s first relevant diagnosis, Pervasive Developmental Disorder, Not Otherwise Specified ("PDDNOS"), was made while she was in pre-school and on August 1, 2007, the District's Committee on Preschool Special Education ("CPSE") classified K.B. as a student with a disability because of that diagnosis. (56.1 ¶ 3; Ex. 58).[2] That diagnosis indicated further that K.B. was born after induced labor because of preeclampsia and exhibited oppositional defiant difficulties. (Ex. 58). Less than two years later, on March 23, 2009, the CPSE declassified K.B. as disabled based on her classroom performance and the evaluative information available to them. (56.1 ¶ 4; Ex. 66 at 1). The District, on September 22, 2014, informed Plaintiffs that K.B.'s PDDNOS diagnosis "would need to be updated." (56.1 ¶ 15; Ex. 120).

_____

[2] The parties' submissions on these motions—including the joint Rule 56.1 Statement—and the SRO's decision each cite to exhibits in the administrative record as they are numbered therein. For ease of reference and the sake of consistency, the Court does the same in lieu of citing to the pagination generated by ECF.

Dr. Lawrence Gordon ("Gordon") provided K.B. with an ear, nose, and throat ("ENT") evaluation on January 5, 2017. (Ex. 114). Gordon concluded that although her hearing was normal, her "audiologic and speech testing [we]re consistent with sensory processing disorder." (*Id.* at 2).[3] Approximately two weeks later, on January 22, 2017, Dr. Patricia Mangan ("Mangan") diagnosed K.B. with generalized anxiety disorder ("GAD") and observed that a diagnosis of attention-deficit/hyperactivity disorder ("ADHD") was inconsistent with her evaluations and that any "attentional issues [we]re secondary to [K.B.'s] anxiety." (Ex. 61).

Plaintiffs referred K.B. for a neuropsychological evaluation with Joshua Shifrin, PhD, ABSNP, NCSP ("Shifrin") in connection with their request for a determination as to K.B's eligibility under IDEA.[4] Shifrin, in a report dated July 13, 2018, diagnosed K.B. with GAD, Dysthymia, and Dyscalculia.[5] (56.1 ¶ 81; Ex. 104 at 41). Shifrin's comprehensive report was based on interviews with K.B. and Plaintiffs, various evaluative tests administered to K.B., and Shifrin's behavioral observations of K.B. (Ex. 104 at 1).

K.B. also received a psychosocial evaluation in connection with the CSE proceedings. That evaluation was administered by K.B.'s school psychologist, Kristen Kurpick ("Kurpick"), who

---

[3] The record here was filed under seal, as is common in IDEA cases. As such, and in an abundance of caution, the Court will quote herein only to information that is substantively disclosed in the parties' briefing and thus, already made public. Moreover, both the IHO and SRO decisions quote from the same administrative record and were publicly filed with the Complaint. (Doc. 1-1, "IHO"; Doc. 1-2, "SRO"). The need for the Court to conduct a *de novo* review and cite directly to the record outweighs the potential privacy interest in refraining from doing so, especially in light of Plaintiffs' and K.B.'s pseudonymity in this matter. *See e.g. and generally*, *W.G. v. New York City Dep't of Educ.*, 801 F. Supp. 2d 142 (S.D.N.Y. 2011).

[4] New York assigns responsibility for fulfilling the state's obligations under IDEA to a local Committee on Special Education ("CSE"). N.Y. Educ. Law § 4402(1)(b)(1)(a); *C.L. v. Scarsdale Union Free Sch. Dist.*, 744 F.3d 826, 833 (2d Cir. 2014).

[5] "Dysthymic Disorder is characterized by chronic, less severe depressive symptoms [than Major Depressive Disorder] that have been present for many years." *Santiago v. Astrue*, No. 11-CV-06873, 2012 WL 1899797, at *3 (S.D.N.Y. May 24, 2012). Dyscalculia concerns "[d]ifficulty in performing simple mathematical problems." *Bd. of Educ. of Yorktown Cent. Sch. Dist. v. C.S.*, 357 F. Supp. 3d 311, 317 (S.D.N.Y. 2019), *aff'd*, 990 F.3d 152 (2d Cir. 2021) (internal citation removed).

reviewed K.B.'s academic records, social history, and various evaluative tests, and interviewed K.B. (Ex. 105 at 1). Kurpick concluded that K.B.'s communication and socialization skills were in the moderately low range, but that she had an elevated level of internalizing behaviors and an average level of externalizing behaviors. (*Id.* at 6).

  B. <u>K.B.'s Academic Record and Teacher Reviews</u>

    *i. Kindergarten and Elementary School*

  K.B. attended District schools from September 2009 to June 2018 during which time she completed kindergarten through seventh grade. (56.1 ¶ 2; Ex. 117 at 1-2). At the end of K.B.'s kindergarten year, in June 2010, the District and K.B.'s teacher concluded that it was in her best interests for her to repeat the grade. (Ex. 60).

  Elementary school grades for K.B. were based on a 1-4 scale in which: a level 1 score represents that a student is well below proficiency standards; a level 2 score represents that a student is below proficiency standards; a level 3 score represents that a student meets proficiency standards; and a level 4 score represents that a student exceeds proficiency standards. (*See e.g.,* Ex. 5 at 1). K.B.'s report cards for first and second grades are not complete in the record, but the record suggests that K.B. received only level 3 and level 4 scores during that time. (Ex. 3; Ex. 4). In third grade, K.B. finished the year with a level 3 score in 58/60 skills categories across various classes, a level 2 score in planning, revising, and editing writing for english language arts ("ELA"), and a level 4 score in music. (Ex. 5 at 1-2). K.B. received no level 1 scores that year. (*Id.*). In fourth grade, K.B. finished the year with a level 3 score in 70/73 skills categories and level 2 scores in three categories: (i) general – uses time effectively; (ii) general – completes homework; and (iii) math – comparing fractions. (Ex. 6 at 1-2). In fifth grade, K.B. finished the year with a level 3 score in 60/65 skills categories, receiving three level 4 scores—in ELA, Art, and Orchestra—and two level 2 scores in math. (Ex. 7 at 1-2). K.B. received positive remarks from teachers throughout

elementary school, including: (i) third grade, stating that "[s]he has made progress in all areas, including math" (Ex. 6 at 2); (ii) fourth grade, stating that she "[t]akes pride in work well done" (Ex. 7 at 2); and (iii) fifth grade, stating that she "is continuing to grow in independence [and] her work is improving" (Ex. 8 at 2).

### ii.  Sixth and Seventh Grade

Middle school grades in the District's schools were based on a 100-point percentage grading scale, whereby a quarterly average grade across all classes between 85 and 89 qualified a student for "merit roll" and an average grade between 90 and 100 qualified a student for "honor roll." (*See e.g.*, Ex. 15). In sixth grade, K.B. finished the first and second quarters of the year with a 79 and 83 average, respectively. (*Id.*). K.B. finished the third and fourth quarters on the merit roll, with 89 and 88 averages, respectively. (*Id.*). K.B.'s final average for the year across all classes was an 86.8. (*Id.*). K.B. received final grades of 78 in math, 71 in social studies, and 76 in science. (*Id.*). On her final progress report for the year, K.B. received relevant teacher comments of: (i) "effort is good[,] progressing satisfactorily" in ELA; (ii) "doing better, progressing satisfactorily" in math; (iii) "doing a fine job" in science; and (iv) "homework missing/incomplete" in social studies. (Ex. 11).

In seventh grade, K.B.'s final year in District schools, she finished all four quarters on the merit roll, with respective quarterly averages of 88, 87, 86, and 88. (Ex. 23). K.B. finished the year with an 87.5 overall average. (*Id.*). Her only scores in the 70's range were ELA at 78 and math at 77.[6] (*Id.*). On her final progress report for the year, K.B. received relevant teacher comments of: (i) "effort is good[,] a pleasure to have in class" in ELA; (ii) "a pleasure to have in class . . . quiz/test grades need improvement" in math; (iii) "a pleasure to have in class . . . excellent

---

[6] In a progress report dated March 14, 2018, K.B. was listed as failing or borderline failing in ELA with a 69 average, but she was apparently able to bring her grade up by the end of that quarter.

participation" in science; and (iv) "a pleasure to have in class [but] inconsistency in effort" for social studies. (Ex. 19). K.B. also had two behavioral incidents occur during her seventh grade year: (i) on December 22, 2017, she "at the behest of the 'cool kids' in French class" drew an inappropriate and racist symbol on a greeting card and handed it to another student, which the school psychologist deemed "extremely inappropriate" and for which she received a two-day suspension (56.1 ¶¶ 41-42); and (ii) "arrived late to school an excessive number of times (16 late arrivals out of 83 possible schools days)." (Ex. 62).

K.B. was enrolled for her eighth-grade year at Storm King School ("SKS"), a grade 8-12 college preparatory school with an average class size of 10 students. (56.1 ¶¶ 226-227). SKS used a traditional letter-grade and GPA scale. (*See e.g.,* Ex. 135). In eighth grade, K.B. received first semester grades of: (i) english – B; (ii) pre-algebra – B; (iii) spanish – B+, and second semester grades of: (i) art – B-; (ii) algebra – B; (iii) history – B+; science – B-. (*Id.*). She had a 3.00 GPA for both semesters. (*Id.*). She also participated in band, cross-country, lacrosse, and theater. (*Id.*). Shifrin conducted a follow-up evaluation of K.B. after she enrolled in SKS and observed that K.B. was attentive and confident in math class—but that the teacher differentiated her teaching style for certain students, including K.B., and that K.B. went to that teacher for extra help more than the other students. (Ex. 159 at 3-4). Shifrin spoke with one of the SKS administrators, who indicated that K.B. had made significant academic and social progress due to small class sizes and extra attention from faculty. (*Id.* at 4).

   C.   K.B.'s Test Results

K.B. has undergone various standardized and clinical tests relevant to this analysis.

First, as to standardized testing, K.B. took New York State Testing Program ("NYSTP") tests in ELA each year from third to seventh grade, math each year from fourth to seventh grade,

and science in fourth grade only.[7] (Exs. 28-37). NYSTP tests are scored on a 1-4 scale, in which the scoring levels equate to proficiency in the same manner as the elementary school grades described *supra*. (*See e.g.*, Ex. 28 at 1). In third grade, K.B. tested at level 2 for ELA and was in the 63rd percentile for the State. (*Id.*). In fourth grade, K.B. tested at level 3 for ELA, level 2 for math, and level 4 for science and was in the 87th, 42nd, and 91st percentiles, respectively, for the State. (Exs. 29-31). In fifth grade, K.B. tested at level 3 for ELA and level 2 for math, and was in the 83rd and 36th percentiles, respectively, for the State. (Exs. 32-33). In sixth grade, K.B. tested at level 2 for ELA and level 2 for math, and was in the 66th and 33rd percentiles, respectively, for the State. (Exs. 34-35). In seventh grade, K.B. tested at level 3 for ELA and level 2 for math, and was in the 84th and 56th percentiles, respectively, for the State. (Exs. 36-37). K.B. did not take the NYSTP in eighth grade, presumably because she was no longer enrolled in public school. She did, however, take the Preliminary Scholarly Aptitude Test ("PSAT"). (Ex. 128). K.B. scored 880 out of 1440 on the PSAT, which placed her in the 65th percentile of test-takers nationally. (*Id.* at 1). She scored 480 out of 720 in reading and writing, putting her in the 78th percentile in that section, and 400 out of 720 in math, putting her in the 46th percentile in that section. (*Id.*).

Second, as to clinical testing, K.B. underwent: (i) an ADHD System test administered by Mangan on December 5, 2016 (ex. 101); (ii) the Wechsler Intelligence Scale for Children ("WISC"), Wechsler Individual Achievement Test ("WIAT"), a Developmental Neuropsychological assessment ("NEPSY"), Test of Written Language ("TOWL"), and the Behavior Assessment System for Children ("BASC") administered by Shifrin on July 13, 2018 (Ex. 104); (iii) Woodcock-Johnson-IV Tests of Cognitive Abilities ("WJ-IV") and Vineland Adaptive Behavior Scales ("Vineland") administered by Kurpick on July 20, 2018 (Ex. 105); (iv)

---

[7] The tests listed herein are those with results available in the record.

additional WJ-IV testing administered by District teacher Margaret O'Donnell ("O'Donnell") on August 20, 2018 (Ex. 106); and (v) follow-up WIAT and BASC testing administered by Shifrin in August of 2019 (Ex. 166).

### D.   Relevant Educational Accommodations

The District decided, in June 2009, to forego a Section 504 plan for K.B.,[8] instead opting to give her time to adjust to kindergarten before reconsidering in November of that year. (56.1 ¶ 6; Ex. 59). Plaintiffs four times thereafter—in K.B.'s kindergarten, third, fourth, and sixth grade years, prior to the CSE determination at issue here—requested that the District consider a Section 504 plan for K.B., and the District each time declined to do so. (*Id.*  ¶¶ 6-10, 14-15; Ex. 65 at 1). K.B. began seeing private tutors for math and reading comprehension in third grade. (*Id.* ¶ 11-12). K.B. participated in "homework club" in sixth grade and that same year received Academic Intervention Services ("AIS") through the District for math. (*Id.* ¶ 21). K.B. also continued her private math tutoring in sixth grade. (*Id.* ¶ 31). Finally, while at SKS for eighth grade, although the school offered a separate academic support program to provide "even smaller class sizes as compared to the general SKS academic program, the availability of more accommodations, and an executive functioning class," K.B. did not enroll in that program. (56.1 ¶¶ 228-29).

## II.   The CSE Proceedings and Determination

Defendant notified Plaintiffs on June 1, 2018 that K.B. had been referred to the District's CSE, in response to concerns about her progress, and requested Plaintiffs' consent to an initial eligibility evaluation for special education services. (Ex. 72). Plaintiffs gave consent and the CSE convened on August 22, 2018. (Ex. 73). Present at the CSE meeting were: (i) Heather Hendershot,

---

[8] "A 504 plan summarizes accommodations made for students with conditions that affect their ability to learn, behavior, or emotional status that do not rise to the level of disabilities under the Americans with Disabilities Act. It is governed by the provisions of Section 504 of the Rehabilitation Act of 1973 and associated regulations, as well as state law (New York Education Law § 4402) and regulation." *Krause v. Kelahan*, No. 17-CV-01045, 2020 WL 2838859, at *4 (N.D.N.Y. May 29, 2020).

the Committee Chair ("Hendershot"); (ii) Angela Blake, a School Psychologist ("Blake"); (iii) Ama LaRegina, a Special Education Teacher ("LaRegina"); (iv) Kathy Higgins, K.B.'s sixth grade General Education Teacher ("Higgins"); (v) Sarah McNulty, a Speech/Language Therapist ("McNulty"); (vi) Plaintiffs; and (vii) Plaintiffs' family friend. (Ex. 73 at 1; Ex. 75). Each CSE member was given approximately one week's notice of the meeting, which lasted approximately one hour. (56.1 ¶¶ 108-09). The CSE considered: (i) Shifrin's evaluation and the tests he administered; (ii) Gordon's report; (iii) Kurpick's educational evaluation and the tests she performed; (iv) O'Donnell's psychosocial evaluation and tests she conducted; (v) K.B.'s academic record; (vi) Mangan's ADHD assessment; (vii) Higgins's classroom observations; and (viii) comments from Plaintiffs and the family friend. (Ex. 74 at 2-3). The CSE determined, based upon the foregoing, that K.B. was ineligible for classification as a student with a disability at that time. (*Id.* at 3). The CSE found that K.B. did not exhibit a significant delay or disorder in any relevant functional areas and that she also did not meet the classification of emotionally disturbed or hearing impaired. (*Id.*). The CSE thereafter denied special education services but recommended that K.B.'s progress be monitored for four to six weeks and that she be considered for a Section 504 referral if she had not made progress during that time. (*Id.*).

## III. Administrative Proceedings

Plaintiffs appealed the CSE's determination to an impartial hearing officer ("IHO") appointed by the local board of education pursuant to 20 U.S.C. § 1415(f) and New York Education Law § 4404(1)(a). Plaintiffs subsequently appealed the IHO's decision to an SRO in accordance with New York Education Law § 4404(2). The Court has analyzed both of these decisions in their entirety and refers to them where relevant throughout this decision. For the sake of brevity, the Court summarizes each decision only as required to provide context.

A. The IHO's Decision

Plaintiffs appealed the CSE's substantive eligibility determination in a due process complaint to an IHO on February 26, 2019, alleging that Defendant failed to provide K.B. a FAPE in violation of IDEA and failed to provide K.B. with a Section 504 plan. The IHO held five days of hearings between June 18, 2019 and November 14, 2019. (IHO at 2). The decision was issued on March 19, 2020. (IHO at 34). The IHO held that the CSE determined correctly that K.B. was not eligible for special education services as a child with a disability under IDEA. (IHO at 29). After considering each of the five characteristics of "emotional disturbance," the IHO found that K.B. did not exhibit any such characteristics. (IHO at 27). The IHO found further that K.B. could not be classified as having a learning disability because any impairments she had did not adversely affect her in school. (IHO at 28). As to the procedural defects raised by Plaintiffs, the IHO determined that the CSE was appropriately staffed with proper evaluative information before it. (IHO at 25-26). Finally, the IHO decided that it need not consider whether SKS was an appropriate private placement, but that SKS "appeared to provide [K.B.] with [the] same level of accommodations as a regular education program." (IHO at 32).[9]

B. The SRO's Decision

Plaintiffs appealed the IHO's decision to an SRO on April 17, 2020. (Doc. 7-7 at 2). The SRO, on July 1, 2020, issued a thorough 35-page decision upholding the IHO's ultimate decision as to Plaintiffs' entitlement to tuition reimbursement. The SRO, however, disagreed with two of the IHO's factual findings, and concluded that: (i) the CSE did not conduct all evaluations required

---

[9] The IHO also considered Plaintiffs' arguments as to Section 504 and determined that the District did not violate its obligations thereunder to "find" and identify children with disabilities and give them equal access to public accommodations. (IHO at 29). The SRO, however, determined that it did not have jurisdiction to review that issue. (SRO at 3 n.3). As discussed *infra*, the Court reviews Plaintiffs' Section 504 claim using the traditional standard for summary judgment without giving deference to administrative proceedings and, therefore, need not and does not rely on the IHO's determination as to Section 504. The Court, therefore, declines to address the jurisdictional issue raised by the SRO on that matter.

by State regulation; and (ii) K.B. exhibited one characteristic of emotional disturbance. (SRO at 11, 21). The SRO found, however, that neither contradiction disturbed the IHO's ultimate decision because, respectively: (i) the procedural defect did not deny K.B. a FAPE; and (ii) K.B.'s educational performance was not adversely affected by that one characteristic of emotional disturbance. (SRO at 12, 22).

This litigation followed.

## STANDARD OF REVIEW

### I. IDEA

"Summary judgment in the IDEA context . . . is only a pragmatic procedural mechanism for reviewing administrative decisions." *W.A. v. Hendrick Hudson Cent. Sch. Dist.*, 927 F.3d 126 (2d Cir. 2019) (internal quotation omitted) "Federal courts reviewing administrative decisions [under IDEA] must give 'due weight' to the administrative proceedings, 'mindful that the judiciary generally lacks the specialized knowledge and experience necessary to resolve persistent and difficult questions of educational policy.'" *Grim v. Rhinebeck Cent. Sch. Dist.*, 346 F.3d 377, 381 (2d Cir. 2003) (quoting *Walczak v. Fla. Union Free Sch. Dist.*, 142 F.3d 119, 129 (2d Cir. 1998)).

Courts reviewing a state agency's decision must base their decision on a preponderance of the evidence and may not substitute their own views on educational policy for those of the school authorities. *W.A.*, 927 F.3d at 144. Review of the state's educational decisions is therefore limited, demanding a level of scrutiny that is more critical than clear error but not nearly as complete as *de novo*. *See C.F. ex rel. R.F. v. N.Y.C. Dep't of Educ.*, 746 F.3d 68, 77 (2d Cir. 2014). The Court's *de novo* review therefore "only seeks to independently verify that the administrative record supports the district court's determination" regarding the sufficiency of the state's educational decisions. *Mr. P v. W. Hartford Bd. of Educ.*, 885 F.3d 735, 748 (2d Cir. 2018).

Deference to the administrative decision is particularly appropriate when the administrative officer's review has been thorough and careful, and where—as here—the court's decision is based solely on the administrative record. *See M.H. v. New York City Dep't of Educ.*, 685 F.3d 217, 241 (2d Cir. 2012). While this Court "do[es] not simply rubber stamp administrative decisions," *Walczak*, 142 F.3d at 129, review of the administrative decision "is by no means an invitation to the courts to substitute their own notions of sound educational policy for those of the school authorities which they review." *Bd. of Educ. of Hendrick Hudson Cent. Sch. Dist., Westchester Cty. v. Rowley*, 458 U.S. 176, 206 (1982). "However, the district court is not required to defer to administrative determinations regarding matters of law." *K.H. v. New York City Dep't of Educ.*, No. 12-CV-01680, 2014 WL 3866430, at *15 (E.D.N.Y. Aug. 6, 2014).

The Court must determine first whether the SRO reached "reasoned conclusions" before affording deference. *See M.H.,* 685 F.3d at 246 ("Reviewing courts must look to the factors that normally determine whether any particular judgment is persuasive [and must ultimately] defer to the SRO's decision on matters requiring educational expertise unless [the court] concludes that the decision was inadequately reasoned."). "But the district court's determination of the persuasiveness of an administrative finding must also be colored by an acute awareness of institutional competence and role . . . . [T]he purpose of the IDEA is to provide funding to states so that they can provide a decent education for disabled students consistent with their traditional role in educating their residents." *Id.* at 244.

At the administrative level, the burden of proof and persuasion falls on the school district to demonstrate that the student was not denied a FAPE. N.Y. Educ. Law § 4404(1)(c). On appeal to a federal court, however, the burden of demonstrating that an SRO ruled incorrectly falls on the party challenging that decision. *M.H.*, 685 F.3d at 225 n.3.

II. <u>Section 504</u>

A motion for summary judgment on a Section 504 claim, unlike IDEA, is reviewed under the traditional Federal Rule of Civil Procedure 56 standard, i.e., that there is no genuine issue of material fact and the movant is entitled to judgment as a matter of law. *Pinn ex rel. Steven P. v. Harrison Cent. Sch. Dist*., 473 F. Supp. 2d 477, 483 (S.D.N.Y. 2007) ("Unlike in the case of Plaintiff's IDEA claim, summary judgment is appropriate in the case of their Rehabilitation Act claim only if there is 'no genuine issue as to any material fact.'" (quoting Fed. R. Civ. P. 56(c))).

Under Federal Rule of Civil Procedure 56, a "court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). "A fact is 'material' if it 'might affect the outcome of the suit under the governing law,' and is genuinely in dispute 'if the evidence is such that a reasonable jury could return a verdict for the nonmoving party.'" *Liverpool v. Davis*, 442 F. Supp. 3d 714, 722 (S.D.N.Y. 2020) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)). "'Factual disputes that are irrelevant or unnecessary' are not material and thus cannot preclude summary judgment." *Sood v. Rampersaud*, No. 12-CV-05486, 2013 WL 1681261, at *1 (S.D.N.Y. Apr. 17, 2013) (quoting *Anderson*, 477 U.S. at 248). The Court's duty, when determining whether summary judgment is appropriate, "is not to resolve disputed issues of fact but to assess whether there are any factual issues to be tried." *Id*. (quoting *Wilson v. Nw. Mut. Ins. Co.*, 625 F.3d 54, 60 (2d Cir. 2010)). Indeed, the Court's function is not to determine the truth or weigh the evidence; the task is material issue spotting, not material issue determining. Therefore, "where there is an absence of sufficient proof as to one essential element of a claim, any factual disputes with respect to other elements of the claim are immaterial . . . ." *Bellotto v. Cty. of Orange*, 248 F. App'x 232, 234 (2d Cir. 2007) (quoting *Salahuddin v. Goord*, 467 F.3d 263, 281 (2d Cir. 2006)). Claims simply cannot proceed in the absence of sufficient proof as to an essential element.

Should there be no genuine issue of material fact, the movant must establish also its "entitlement to judgment as a matter of law." *In re Davis New York Venture Fund Fee Litig.*, 805 F. App'x 79, 80 (2d Cir. 2020) (quoting *FIH, LLC v. Found. Capital Partners LLC*, 920 F.3d 134, 140 (2d Cir. 2019)). Stated simply, the movant must establish that the law favors the judgment sought. *Gonzalez v. Rutherford Corp.*, 881 F. Supp. 829, 834 (E.D.N.Y. 1995) (explaining "that summary judgment is appropriate only when . . . law supports the moving party"); *Linares v. City of White Plains*, 773 F. Supp. 559, 560 (S.D.N.Y. 1991) (explaining that summary judgment is appropriate when "the law so favors the moving party that entry of judgment in favor of the movant . . . is proper").

## ANALYSIS

I. <u>Summary Judgment on the IDEA Claim</u>

Plaintiffs press four arguments in support of their motion for summary judgment on the IDEA claim:[10] (i) Defendant failed to identify and evaluate K.B.; (ii) the CSE was not properly constituted; (iii) the IHO and SRO applied the wrong legal standard with respect to their determinations of K.B.'s eligibility; and (iv) SKS was an appropriate private placement. Defendant maintains, in support of its argument for summary judgment, that the SRO's determination was sound and Plaintiffs fail to meet their burden for reversal. The Court first addresses IDEA's statutory framework as context for the parties' substantive arguments.

A. <u>Statutory Framework</u>

IDEA was enacted "to ensure that all children with disabilities have available to them a free appropriate public education that emphasizes special education and related services designed

---

[10] Because New York Education Law § 4402 is part of New York State's implementing statute for IDEA—and although the parties do not discuss this claim for relief in their summary judgment briefing—the Court's analysis as to the IDEA claim applies equally to the § 4402 claim. The Court is unaware of any case in this Circuit in which New York Education Law § 4402 served as a standalone claim for relief separate from IDEA.

to meet their unique needs and prepare them for further education, employment, and independent living." 20 U.S.C. § 1400(d)(1)(A). States receiving public funds are required to provide a FAPE to children with disabilities. 20 U.S.C. § 1412(a)(1)(A). Public school districts must provide "special education and related services tailored to meet the unique needs of a particular child, [which are] reasonably calculated to enable the child to receive educational benefits." *Walczak*, 142 F.3d at 122 (internal quotation removed). IDEA defines "child with a disability" to mean a child:

> (i) with intellectual disabilities, hearing impairments . . . , speech or language impairments, visual impairments . . . , serious emotional disturbance (referred to in [the statute] as "emotional disturbance"), orthopedic impairments, autism, traumatic brain injury, other health impairments, or specific learning disabilities; and (ii) who, by reason thereof, needs special education and related services.

20 U.S.C. § 1401(3)(A)(i). Applicable regulations issued by the U.S. Department of Education define "emotional disturbance" as:

> a condition exhibiting one or more of the following characteristics over a long period of time and to a marked degree that adversely affects a child's educational performance: (A) An inability to learn that cannot be explained by intellectual, sensory or health factors. (B) An inability to build or maintain satisfactory interpersonal relationships with peers and teachers. (C) Inappropriate types of behavior or feelings under normal circumstances. (D) A general pervasive mood of unhappiness or depression. (E) A tendency to develop physical symptoms or fears associated with personal or school problems.

34 C.F.R. § 300.8(c)(4)(i). This particular regulation also defines "specific learning disability" as:

> a disorder in one or more of the basic psychological processes involved in understanding or in using language, spoken or written, that may manifest itself in the imperfect ability to listen, think, speak, read, write, spell, or to do mathematical calculations, including conditions such as perceptual disabilities, brain injury, minimal brain dysfunction, dyslexia, and developmental aphasia.

*Id.* at § 300.8(c)(10)(i).

The relevant state or local educational agency must conduct an individualized evaluation to determine whether a child has a disability and must develop an annual written individualized education program ("IEP") for each child with a disability. 20 U.S.C. § 1414(d). The evaluation process can be initiated by the agency or the child's parent, cannot be commenced without parental consent, and is subject to statutory temporal and procedural requirements. 20 U.S.C. § 1414(a)(1), In New York, IEPs are developed by local CSEs in conjunction with the disabled student's parents. N.Y. Educ. Law § 4402(1)(b)(1).

IDEA requires that parents be provided with an opportunity to present a complaint regarding the identification, evaluation, or placement of their child through the IEP process. 20 U.S.C. § 1415(b)(6)(A). Parents who are dissatisfied with a school district's disability status determination, or IEP, may unilaterally place their child in a private school, at their own risk, and then seek a retroactive tuition reimbursement from the local school district. 20 U.S.C. § 1412(a)(10)(C). Procedurally, the parent must provide notice ten business days before removing their child from public school. 20 U.S.C. § 1412(a)(10)(C)(iii); *Bd. of Educ. of Yorktown v. C.S.*, 357 F. Supp. 3d 311, 316 (S.D.N.Y. 2016). The purpose of that notice is to provide the school district with "an opportunity to develop a FAPE within the District's own schools - thus saving the cost of reimbursement." *W.M. v. Lakeland Cent. Sch. Dist.*, 783 F. Supp. 2d 497, 506 (S.D.N.Y. 2011).

If parents in New York disagree with any part of the IEP process, they may request an impartial due process hearing administered by an IHO appointed by the local education board. *See* 20 U.S.C. § 1415(f); N.Y. Educ. Law § 4404(1)(a). The IHO's decision may be appealed to an SRO. *See* N.Y. Educ. Law § 4404(2); *see also* 20 U.S.C. § 1415(g). The SRO's decision may thereafter be challenged in state or federal court. *See* 20 U.S.C. § 1415(i)(2)(A).

B.  The SRO's Eligibility Decision

The SRO reviewed K.B.'s eligibility as a student with a disability by considering both whether she could be classified as having a specific learning disability under 34 C.F.R. § 300.309(a) and whether she could be classified as having an emotional disturbance under 34 C.F.R. § 300.8(c)(4)(i). (SRO at 12-31).

Questions as to whether a child meets the criteria for being emotionally disturbed involve interpretation of IDEA and the definition of "emotional disturbance" under applicable regulations. Thus, "the district court [is] as well-positioned as the state administrative officials to determine [a student's] eligibility." *Muller v. Comm. on Special Educ. of the E. Islip Union Free Sch. Dist.*, 145 F.3d 95, 102 (2d Cir. 1998); *see also W.G.*, 801 F. Supp. 2d at 167. A district court is not required to give state administrative proceedings special weight when the administrative decision concerns an issue of law. *Id.* (citing *Mrs. B v. Milford Bd. of Educ.*, 103 F.3d 1114, 1122 (2d Cir. 1997)). Accordingly, this Court considers *de novo* whether K.B. met the statutory requirements for a disability. *See C.B. ex rel. Z.G. v. Dep't of Educ. of City of New York*, 322 F. App'x 20, 21 (2d Cir. 2009) ("[N]o deference is required where, as here, the district court is presented with the threshold question of a child's statutory eligibility for special education services; to wit, whether the child was disabled.").

*i.  Whether the SRO Properly Determined that K.B. Did Not Have a "Specific Learning Disability"*

Plaintiffs argue that the SRO failed to properly identify K.B. as having a specific learning disability both as to her deficiencies in math and as to her auditory processing disorder. (Pl. Br. at 18-21). IDEA provides that the term "child with a disability" includes a child "with . . . specific learning disabilities." 20 U.S.C. § 1401(3)(A)(i). Federal regulations promulgated under IDEA define "specific learning disability" as "a disorder in one or more of the basic psychological

17

processes involved in understanding or in using language, spoken or written, that may manifest itself in the imperfect ability to listen, think, speak, read, write, spell, or to do mathematical calculations." 34 C.F.R. § 300.8(c)(10)(i). A CSE may determine that a student has a specific learning disability if:

> (1) The child does not achieve adequately for the child's age or to meet State-approved grade-level standards . . . [and] (2)(i) The child does not make sufficient progress to meet age or State-approved grade-level standards . . . or (ii) The child exhibits a pattern of strengths and weaknesses in performance, achievement, or both, relative to age, State-approved grade-level standards, or intellectual development.

34 C.F.R. § 300.309(a). New York regulations clarify further that a learning disability "manifests itself in an imperfect ability to listen, think, speak, read, write, spell, or to do mathematical calculations." 8 N.Y. Comp. Codes R. & Regs. § 200.1(zz)(6). New York regulations, however, contain the same materiality qualifier as federal regulations in that the existence of a learning disability turns upon whether the student "achieve[s] adequately." *Id.* at § 200.4(j)(3).

### a.    K.B.'s Math Deficiencies

The SRO found that K.B.'s deficiencies in math did not form the basis for a classification as a "student with a disability" for purposes of IDEA because "while . . . the student struggled with math and auditory processing, the student's difficulties did not impact her educational performance to the degree that she required special education." (SRO at 29). The Court agrees. There is no dispute that Shifrin diagnosed K.B. with dyscalculia and that her grades in math were, in general, lower than her grades in other classes. The relevant inquiry, however, is whether K.B. "d[id] not achieve adequately . . . [and] d[id] not make sufficient progress . . . [or] exhibit[ed] a pattern of strengths and weaknesses in performance." 34 C.F.R. § 300.309(a). Plaintiffs argue that "K.B. did not meet state-approved grade level standards, nor did she make sufficient progress in math despite various *ad hoc* interventions." (Pl. Br. at 20).

The record, based upon the Court's *de novo* review, belies Plaintiffs' conclusion. In sixth and seventh grade, focusing solely on math, K.B. finished each year with a 78 average. (Ex. 15; Ex. 23). Her sixth grade math teacher commented that she was "doing better, progressing satisfactorily," and her seventh grade teacher commented that she was "a pleasure to have in class . . . [but] quiz/test grades need improvement." (Ex. 11; Ex. 19). These comments do not reflect a hopeless math student. On standardized tests, K.B. tested in the 36th percentile for math in sixth grade and the 56th percentile in seventh grade. (Ex. 35; Ex. 37). K.B.'s math testing improved, despite the fact she was no longer receiving AIS math tutoring in seventh grade. The totality of K.B.'s math record indicates that she did achieve adequately and made progress in math while she was enrolled in the District's schools. K.B. consistently placed in the second and third quartiles for math on standardized tests, received primarily positive teacher comments, received—albeit slightly lower—sufficient grades in class, and grew out of her AIS tutoring. Finally, even Shifrin testified to the IHO that K.B.'s WIAT math results were "technically" in the average range. (Tr. at 583-85).[11]

Plaintiffs rely entirely on *M.S. ex rel. S.S. v. Bd. of Educ. of the City Sch. Dist. of the City of Yonkers*, 231 F.3d 96 (2d Cir. 2000) to upend the SRO's determination by arguing that case stands for the proposition that "when [a] student 'is disabled within the meaning of IDEA,' and the District fails to provide FAPE, any reliance on the passing grades is misplaced and irrelevant." (Pl. Br. at 21 (quoting *M.S. ex rel. S.S.* 231 F.3d at 104)). This argument, however, is inapposite. The SRO never determined that K.B. was disabled under IDEA. Rather, the SRO determined that the definition of "specific learning disability" did not apply because K.B.'s "math difficulties did

---

[11] "Tr." refers to the transcript of the IHO hearing conducted over the course of five different days between June 18, 2019 and November 14, 2019.

not impact her educational performance." (SRO at 29). Furthermore, the SRO did not *only rely on passing grades*; it relied on standardized testing and teacher observations, each of which supported a finding that K.B. achieved adequately in this subject.[12] In sum, a preponderance of the evidence supports the SRO's determination, with respect to her difficulties with math, that K.B. did not have a specific learning disability for purposes of IDEA.

b.      K.B.'s Auditory Processing Disorder

The SRO's determination as to K.B.'s auditory processing mirrors its determination as to her deficiencies in math. "[W]hile . . . the student struggled with math and auditory processing, the student's difficulties did not impact her educational performance to the degree that she required special education." (SRO at 29). K.B.'s January 5, 2017 ENT exam indicated that her results "[we]re consistent with sensory processing disorder." (Ex. 114 at 2). The underlying testing for the ENT's assessment, however, indicated that K.B. scored average or above average in six of seven categories, and below average only in following directions. (Ex. 113 at 1). Nevertheless, the SRO's determination as to K.B.'s auditory processing, again, depended upon the condition's effect on K.B.'s educational performance. The Court agrees that any effect K.B.'s auditory processing had on her academic achievement was, at most, marginal. K.B. excelled in a number of subjects and received consistently strong overall grades—finishing sixth grade with an 86.8 average and

---

[12] Plaintiffs argue in reply that "fourth quarter, *cumulative* 'average' grades and *average* academic testing" do not stand up in light of K.B.'s quarterly grades and mid-semester progress reports. (Pl. Opp. at 21 (emphasis in original)). Plaintiffs cite to no authority—and the Court is unaware of any—that would support this position. Fourth quarter cumulative grades and average test scores provide the most accurate benchmarks for a student's progress in any given subject. Likewise unavailing is Plaintiffs' attempt to subvert the SRO's decision by citing to "multi-year substandard grade level performance on state testing." (Pl. Opp. at 21). The SRO held specifically that "although [K.B.] continued to perform at level 2 on the NYSTP math assessment the evidence in the hearing record indicates that her performance on the assessment improved between sixth and seventh grade, even without the support of AIS." (SRO at 29). K.B. placed in the 56th percentile for math on the NYSTP in seventh grade. (Ex. 37). If that score supported a finding of a specific learning disability, then New York could potentially be obligated to provide a special education to more than half of its seventh grade students.

seventh grade with an 87.5 average, and therefore making the merit roll each year. (Ex. 15; Ex. 23). K.B.'s standardized testing and teacher evaluations also indicate that any issues with auditory processing did not affect her academic achievement. Apart from a few remarks that she seemed distracted in one or two classes in particular quarters, K.B.'s teachers reported exuberantly about her performance in class. In sum, a preponderance of the evidence supports the SRO's finding that, as to her auditory processing issues, K.B. did not have a specific learning disability.

> ii.  *Whether the SRO Properly Determined that K.B. Was Not "Emotionally Disturbed"*

Plaintiffs argue next that the SRO improperly found K.B. ineligible under IDEA because it found that K.B. was not "emotionally disturbed." (Pl. Br. at 19-20).  Regulations promulgated under IDEA define "emotional disturbance" as a condition exhibiting one of five characteristics, listed *supra*, that exists "over a long period of time and to a marked degree that adversely affects a child's educational performance." 34 C.F.R. § 300.8(c)(4)(i).

The SRO considered each category of emotional disturbance and, in a thorough decision, determined that K.B. only qualified for one category, a tendency to develop physical symptoms or fears associated with personal or school problems. (SRO at 13-21). The SRO reasoned, however, that the condition did not have an adverse effect on K.B.'s educational performance and, therefore, she was not eligible for special education under IDEA. *Id.* at 21-23.

Plaintiffs' argument on this score is two-fold: first, that the SRO erred in its determination that K.B. did not exhibit any other emotional disturbance characteristics; and second, that the SRO erred in its determination that the fifth characteristic of emotional disturbance that K.B. exhibited did not affect her educational performance. The Court finds, upon a *de novo* review of the record, that the SRO was correct in each of these determinations.

        a.      Inability to Learn, Inability to Build Relationships, Inappropriate Behavior, and Pervasive Mood

Plaintiffs argue that "[b]oth the IHO and SRO incorrectly held that K.B. did not meet any of the [first four] enumerated characteristics for classification under the legal category of emotional disturbance." (Pl. Br. at 19).  Plaintiffs fail to provide additional analysis and do not identify which categories the SRO should have determined applied to K.B. (*Id*.). The Court's *de novo* review of the record indicates that the SRO appropriately decided that none of the first four characteristics of emotional disturbance applied to K.B.

As to the first characteristic, the SRO found that K.B.'s "attention and executive functioning and social perception skills fell at or above the expected level, while her language and memory and learning indices fell at the borderline to expected level." (SRO at 15 (quoting Ex. 104 at 21)). Moreover, the SRO determined that even if K.B. had relative weaknesses in certain areas, "a relative weakness does not indicate an inability to learn." (SRO at 16). The record demonstrates that neither K.B.'s anxiety nor any of her other conditions impeded her ability to learn to the degree necessary to justify a classification in the first category. The record reflects that K.B. participated actively in her classes and achieved adequately therein. The Court therefore agrees with the SRO that K.B. did not exhibit "[a]n inability to learn that cannot be explained by intellectual, sensory or health factors." 34 C.F.R. § 300.8(c)(4)(i)(A).

As to the second characteristic, the SRO found that K.B. "was outgoing, made friends easily (albeit few close friends) and had appropriate relationships with adults and peers." (SRO at 16 (quoting Tr. at 370-73)). The record supports a finding that K.B. did not exhibit "[a]n inability to build or maintain satisfactory interpersonal relationships with peers and teachers." 34 C.F.R. § 300.8(c)(4)(i)(B).

As to the third characteristic, the SRO determined that "while the student experienced anxiety in response to stressful situations, the student's behavior under the circumstances in which she found herself were not so unusual to satisfy the third characteristic." (SRO at 19). The only evidence in the record of K.B.'s inappropriate behavior or feelings relevant to the third characteristic is that: (i) Kurpick determined that K.B. had an elevated level of internalizing behaviors (Ex. 105 at 6); and (ii) K.B. was involved in a racist incident in seventh grade (56.1 ¶ 41). As to the first issue, the SRO determined that "one rating (student self-report) was not enough information to base a decision on whether a student qualified as having emotional disturbance." (SRO at 18 (quoting Tr. at 230-31)). As to the second, the SRO determined that "while [it was] an example of poor judgment by the student under peer pressure, the single incident is not sufficient to find that the student met one of the criteria for an emotional disability." (SRO at 18). The Court agrees that neither a single rating on an evaluation testing numerous emotional skillsets, nor an isolated behavioral incident by a middle school student, is sufficient to establish that K.B. exhibited "[i]nappropriate types of behavior or feelings under normal circumstances." 34 C.F.R. § 300.8(c)(4)(i)(C); *see e.g.*, *W.G.*, 801 F. Supp. 2d at 172 (finding "one piece of documentation" insufficient to establish an emotional disturbance).

Finally, as to the fourth characteristic, the SRO considered Higgins's testimony at the CSE hearing that she "did not observe the student ever presenting with a 'mood of sadness' and indicated that the student was able to 'handle' the sixth-grade curriculum . . . described the student as 'bubbly' and 'fairly outgoing' with a good sense of humor." (SRO at 19 (quoting Tr. at 354-72; 202-06)). The SRO also considered that "[a]lthough the neuropsychologist expressed the opinion that the student experienced a general pervasive mood of unhappiness or depression . . . he also conceded that he relied upon the mother's intake data which did not actually identify sadness or depression." (SRO at 20 (quoting Tr. at 620-21)). Ultimately, the SRO determined that "[t]he

evidence regarding the student's mood was scattered." (*Id.*). The Court agrees that while K.B. experienced anxiety and depression, K.B.'s teacher reviews and the weight of the record indicate that she did not exhibit "[a] general *pervasive* mood of unhappiness or depression." 34 C.F.R. § 300.8(c)(4)(i)(D) (emphasis added).

Accordingly, the SRO correctly determined that K.B. did not exhibit any of the first four characteristics of emotional disturbance.

> b.    Physical Symptoms or Fears

As to the fifth characteristic of emotional disturbance, the SRO disagreed with the IHO and determined that because, *inter alia*, K.B. "bec[ame] physically ill at the thought of going to school," she met the classification of emotionally disturbed under the fifth statutory category.[13] (SRO at 20 (quoting Ex. 105 at 5)). There is no dispute as to this classification. Plaintiffs take issue, however, with the SRO's determination that "although the student appeared to have physical symptoms associated with school . . . the evidence is not clear that it affected the student's educational performance . . . [and] although certainly cause for concern, did not cause her to suffer academically and therefore did not adversely affect her educational performance." (SRO at 22).

IDEA and its implementing regulations do not define "adversely affects educational performance" as the phrase is used in 34 C.F.R. § 300.8(c)(4)(i). *See J.D. ex rel. J.D. v. Pawlet Sch. Dist.*, 224 F.3d 60, 66 (2d Cir. 2000) ("[N]either the IDEA nor the federal regulations define the terms 'need special education' or 'adverse effect on educational performance,' leaving it to each State to give substance to these terms."); *Maus v. Wappingers Cent. Sch. Dist.*, 688 F. Supp. 2d 282, 296 (S.D.N.Y. 2010) ("New York regulations do not define 'educational performance.'"

---

[13] If the SRO and IHO decisions conflict, the IHO's decision may be afforded diminished weight. *W.A.*, 927 F.3d at 126. Reviewing courts "defer to the final decision of the state authorities, that is, the SRO's decision." *M.W. ex rel. S.W. v. New York City Dep't of Educ.*, 725 F.3d 131, 139 (2d Cir. 2013) (internal quotation marks omitted).

(internal citation omitted)). Courts in this Circuit, however, have consistently referred to academic performance in determining whether an emotional disturbance adversely affects a student's educational performance. *See Maus* at 297-98 (collecting cases and holding that a court "must look to [a student]'s academic performance in order to assess whether she is eligible for special education services under IDEA"); *see also A.J. v. Bd. of Educ.*, 679 F. Supp. 2d 299, 311 (E.D.N.Y. 2010) (finding no adverse effect on the education of a student with autism where the student "was performing at average to above average levels in the classroom and was progressing academically").

The SRO appropriately assessed K.B.'s academic performance and determined that it was not adversely effected. As discussed *supra*, K.B. excelled in numerous subjects and maintained an overall grade average in the high-eighties in sixth and seventh grade, performed at or above average on standardized tests, and received positive reviews from her teachers. K.B. performed well in school—even taking into account the lower grades she received in certain classes—and despite her physical symptoms of anxiety, was a good student and a positive influence at her school. Ultimately, "IDEA's statutory purpose . . . is to provide a basic floor of opportunity and not to maximize each student's potential." *Maus*, 688 F. Supp. 2d at 298 n.9. As such, the Court finds that the record supports the SRO's determination that K.B. did not experience an adverse effect on her educational performance sufficient to classify her as emotionally disturbed under IDEA.[14]

---

[14] For these same reasons, even if K.B. exhibited any of the first four characteristics of emotional disturbance, it does not appear to this Court that they adversely affected her educational performance either.

For the foregoing reasons, the Court upholds the SRO's determination that K.B. was not eligible for special education services under IDEA as a student with a disability.[15]

      C.        <u>The SRO's Findings on Procedural Issues</u>

Plaintiff's next argument is that the CSE committed violations of IDEA that impeded K.B.'s right to a FAPE. (Pl. Br. at 14-18). IDEA provides that:

> [i]n matters alleging a procedural violation, a hearing officer may find that a child did not receive a free appropriate public education only if the procedural inadequacies--(I) impeded the child's right to a free appropriate public education; (II) significantly impeded the parents' opportunity to participate in the decision-making process regarding the provision of a free appropriate public education to the parents' child; or (III) caused a deprivation of educational benefits.

20 U.S.C. § 1415(f)(3)(E)(ii). Plaintiffs argue that the CSE was not properly constituted and did not have sufficient evaluative information before it to determine K.B.'s eligibility. Although the Court has already determined by a preponderance of the evidence that K.B. was not eligible under IDEA as a student with a disability, it still must consider whether any procedural defects occurred under 20 U.S.C. § 1415(f)(3)(E)(ii). *See e.g.*, *Maus*, 688 F. Supp. 2d at 299.

With respect to procedural issues, when a court is presented with a thorough, well-reasoned SRO determination, unlike questions of eligibility under IDEA, some level of deference is afforded the SRO's decisions. *C.L. v. Scarsdale Union Free Sch. Dist.*, 744 F.3d 826, 838 (2d Cir. 2014) (explaining that the deference owed depends on "whether the decision being reviewed is well-reasoned, and whether it was based on substantially greater familiarity with the evidence and the witnesses than the reviewing court."); *M.S. v. New York City Dep't of Educ.*, No. 09-CV-04454,

---

[15] The final element of the definition of "student with a disability" under IDEA regulations is that the student "by reason thereof, needs special education and related services." 34 C.F.R. § 300.8(a)(1). However, the SRO correctly determined that "[a]s the evidence in the hearing record does not support a finding that the student met the criteria for one of the disability categories . . . it is not necessary to determine whether the student was in need of a special education." (SRO at 31); *see also W.G.*, 801 F. Supp. 2d at 175.

2010 WL 9446052, at *19 (S.D.N.Y. Mar. 12, 2010) ("[D]istrict courts [ought] to defer to the IHO's and SRO's determinations regarding procedural as well as substantive issues"). With respect to the procedural issues raised by Plaintiffs, the Court finds that the SRO's decision is well-reasoned, thorough, and entitled to deference.

### i.   Whether the CSE Was Properly Constituted

Plaintiffs' first procedural argument is that the CSE was not properly constituted because Higgins taught K.B. in her sixth—not seventh—grade year. IDEA requires that a CSE consist of "not less than 1 regular education teacher of [the] child (if the child is, or may be, participating in the regular education environment)." 20 U.S.C. § 1414 (d)(1)(B)(ii). Nothing in IDEA or its enabling regulations requires that the regular education teacher on the CSE be a student's current teacher. And "not every procedural violation during a CSE evaluation constitutes a denial of a [FAPE]." *Maus*, 688 F. Supp. 2d at 299. The SRO determined that:

> there is no evidence to support that the inclusion of a sixth grade-regular education teacher who was familiar with the student instead of one of the student's seventh grade regular education teachers was so infirm as to have impeded the student's right to a FAPE or significantly impeded the parent's opportunity to participate in the decision-making process, or caused a deprivation of educational benefits.

(SRO at 8). The Court agrees and, moreover, Plaintiffs have not persuasively identified any prejudice as a result of the inclusion of Higgins as the CSE's regular education teacher. *Maus*, 688 F. Supp. 2d at 300 (upholding SRO determination that a procedural violation did not deny FAPE because "[p]laintiffs have not offered any evidence that they were prejudiced"). Plaintiffs argue that "[a] current observation of K.B.'s performance in the classroom is an invaluable tool to understand the impact of K.B.'s impairments in the school setting and her *present levels of functioning*." (Pl. Br. at 16 (emphasis in original)). Yet the record does not indicate that K.B.'s levels of functioning regressed from sixth to seventh grade and, to the contrary, shows that she

made improvements in the classroom during that time. As such, Higgins' observations of K.B. in sixth grade would be more likely to *support* Plaintiffs' position than prejudice it. Thus, the Court upholds the SRO's decision as to the composition of the CSE.

*ii.   Whether the CSE Had Full Information Before It*

IDEA requires that "[e]ach local educational agency shall ensure that . . . the child is assessed in all areas of suspected disability." 20 U.S.C. § 1414(b)(3)(B). Regulations promulgated thereunder specify that "[i]n evaluating each child with a disability . . . the evaluation [must be] sufficiently comprehensive to identify all of the child's special education and related services needs, whether or not commonly linked to the disability category in which the child has been classified." 34 C.F.R. 300.304(c)(6). In New York, such an initial evaluation must include: (1) "a physical examination"; (2) "an individual psychological evaluation"; (3) "a social history"; (4) "an observation of the student in the student's learning environment"; and (5) "other appropriate assessments or evaluations." 8 N.Y. Comp. Codes. R. & Regs. § 200.4(b)(1).

The SRO found, and there is no dispute that, the CSE "failed to conduct all evaluations required by State regulation . . . and for which it obtained the parents' consent." (SRO at 11). The issue, however, is whether this procedural violation denied K.B. a FAPE or impeded Plaintiffs' opportunity to participate in the process. (Pl. Br. at 16). Plaintiffs argue that "[t]he SRO erroneously determined that the District's speech-language pathologist (SLP) attending the eligibility meeting obviated the need for the agreed upon speech and language evaluation" (*id.* (quoting SRO at 11)) and that the failure to conduct the evaluation "rendered the prior parental participation void" and constituted a "failure to identify and evaluate K.B. in all areas of suspected disability . . . r[ising] to the level of a denial of FAPE." (*Id.* at 16-17).

However, the SRO found that the information the CSE *did* have in front of it was sufficient, including the private ENT report that Plaintiffs had provided, which enabled the CSE to make an

appropriate determination as to K.B.'s auditory processing in the absence of the District's own audiological tests. *M.H. v. New York City Dep't of Educ.*, No. 10-CV-01042, 2011 WL 609880, at *9 (S.D.N.Y. Feb. 16, 2011) ("[T]he IDEA 'clearly permits parents to obtain private testing and nowhere implies that local schools must corroborate private results before using them.'" (quoting *Hudson v. Wilson*, 828 F.2d 1059, 1065 (4th Cir. 1987))). That Plaintiffs provided their consent to an audiological evaluation by the District does not mean that Plaintiffs were impeded from participating in the process when the evaluation was not performed. Plaintiffs attended and participated in the CSE hearing and the CSE substituted a District audiological evaluation with one that Plaintiffs provided.

A review of the entire record indicates further that the CSE would have come to the same conclusion as to K.B's ineligibility whether it had before it all statutorily required information or not and, therefore, any such violation did not deny K.B. a FAPE. *See J.D.*, 224 F.3d at 70 (holding that the student "was properly found to be ineligible for special education on account of his above-average basic skills; *a fortiori* he was not denied a free appropriate public education . . . ."). Moreover, the Court is dubious of Plaintiffs' allegation that the CSE did not adequately *consider* the information it did have before it. Plaintiffs have not offered any authority for the proposition that a CSE must review information in the record prior to a meeting. The CSE had 11 eligibility meetings scheduled for the same day as K.B.'s and their educational expertise enables them to review the relevant information in an efficient manner during a one-hour session. *M.S.*, 2010 WL 9446052, at *20 ("Only in egregious circumstances where the plaintiffs demonstrate that a district convened a CSE meeting with an entirely closed mind is a claim of predetermination sufficient to overturn an IEP."). Nevertheless, Plaintiffs have now sought three levels of review of the CSE's decision—to the IHO, SRO, and now this Court—each of which determined after substantial consideration that the totality of the record supports the CSE's determination that K.B. was not

eligible under IDEA. Any purported lack of consideration by the CSE has been compensated for in bounds throughout this lengthy appellate process.

Plaintiffs have not demonstrated that they were prejudiced by the CSE's procedural violations and, accordingly, the Court upholds the SRO's determination that Plaintiffs are not entitled to the relief sought. Given the conclusions reached herein as to K.B.'s statutory eligibility, "it is unnecessary for the Court to review the suitability of the [private] placement." *W.G.*, 801 F. Supp. 2d at 175.

II.   Summary Judgment on Section 504

The parties also move for summary judgment on Plaintiff's Section 504 claim and neither raises any issue of material fact to be tried by a jury. (Pl. Opp. at 6 ("The undisputed material facts establish that K.B. is an 'individual with a disability' under Section 504.")); (Def. Br. at 22 ("Based on this undisputed record, no reasonable trier of fact can find that KB has an impairment that substantially limits the major life activity of learning.")); *see also Rosenberg v. Educ. Credit Mgmt. Corp.*, No. 20-CV-00688, 2020 WL 1048599, at *2 (S.D.N.Y. Mar. 4, 2020) (finding summary judgment appropriate where "the parties agree that there are no genuine issues of material fact"). Moreover, Plaintiff's Section 504 claim is based on the same nexus of operative facts as the IDEA claim. Indeed, the entire factual record was fully developed through two levels of preceding review and has not been supplemented or disputed in front of this Court. *See Maus*, 688 F. Supp. 2d at 294 ("Defendants are also entitled to summary judgment on Plaintiffs' Rehabilitation Act and ADA claims, which arise from the same core facts underlying Plaintiffs' IDEA claim."). As there

is no genuine dispute of any material fact that would preclude judgment in favor of either party, the Court moves to its determination of which party is entitled to judgment as a matter of law.[16]

In order to prevail under Section 504, Plaintiffs must show that: "(1) [the] plaintiff is a qualified individual with a disability; (2) [the] plaintiff was excluded from participation in a public entity's services, programs[,] or activities or was otherwise discriminated against by [the] public entity; and (3) such exclusion or discrimination was due to [the] [plaintiff's] disability." *B.C. v. Mount Vernon Sch. Dist.*, 837 F.3d 152, 158 (2d Cir. 2016) (citation and quotation marks omitted). Moreover, to establish discrimination in the educational context, Plaintiffs must show that Defendant "acted with deliberate or reckless indifference to the student's federally protected rights or with 'bad faith or gross misjudgment.'" *Avaras v. Clarkstown Cent. Sch. Dist.*, No. 15-CV-02042, 2017 WL 3037402, at *27 (S.D.N.Y. July 17, 2017); *see also Rutherford v. Fla. Union Free Sch. Dist.*, No. 16-CV-09778, 2019 WL 1437823, at *34 (S.D.N.Y. Mar. 29, 2019) ("[I]ntentional discrimination may be inferred when a school district acts with gross negligence or reckless indifference in depriving a child of access to a FAPE." (citation omitted)).

While "[t]he definition of 'individual with a disability' under Section 504 of the Rehabilitation Act is broader in certain respects than the definition of a 'child with [a] disability' under IDEA" and "[a] student could therefore qualify for accommodations under Section 504 of the Rehabilitation Act and yet not be entitled to special education services under IDEA," *Maus*, 688 F. Supp. 2d at 287-88 (internal quotation marks, citations, and alterations omitted), the Court need not engage in another lengthy analysis of whether K.B. was disabled—under a slightly

---

[16] As noted *supra*, Plaintiffs do not bring a claim for relief under the ADA, despite referencing that statute in the preliminary statement of their Complaint. Nor do Plaintiffs make any arguments in their motion to support such a claim for relief. In any event, to the extent Plaintiffs purport to bring an ADA claim, because "Section 504 of the Rehabilitation Act and the ADA impose identical requirements," the Court may adjudicate them in tandem. *See Rodriguez v. City of N.Y.*, 197 F.3d 611, 618 (2d Cir. 1999). The Court's holdings herein as to the Section 504 claim apply equally to any ADA claim asserted by Plaintiffs.

different standard—because there is no indication that Defendant acted with bad faith, gross misjudgment, or deliberate indifference.

Plaintiffs argue that "Defendant exhibited deliberate indifference to its Section 504 child find obligations when it consistently failed to identify and evaluate K.B.'s eligibility under Section 504, denying K.B. FAPE." (Pl. Opp. at 16).[17] There is, however, no indication that K.B. "was denied a benefit *because* of her disability" as "general assertions that the District failed to convene [a] CSE or provide IEPs do not establish that the Districts' acts were premised in any way on [K.B.]'s disability." *Schreiber*, 700 F. Supp. 2d at 564 (emphasis in original). That Defendant did not evaluate K.B., even upon Plaintiffs' requests, does not establish deliberate indifference.[18] *See Maus*, 688 F. Supp. 2d at 302 (merely asserting that the District failed to appropriately classify a child, without any evidence of bad faith or gross misjudgment, is not sufficient to defeat summary judgment). Plaintiffs fail to establish, as a matter of law, that Defendant exhibited any bad faith,

---

[17] IDEA also contains a "Child Find" obligation, which is a duty to identify, locate, and evaluate children who are suspected of having a disability and who are in need of special education and related services. *A.P. ex rel. Powers v. Woodstock Bd. of Educ.*, 572 F. Supp. 2d 221, 224-25 (D. Conn. 2008) (citing 20 U.S.C. § 1412(a)(4)(A)), *aff'd*, 370 Fed. App'x 202 (2d Cir. 2010). However, "the IDEA is not an absolute liability statute and the 'Child Find' provision does not ensure that every child with a disability [in need of special education and related services] will be found." *J.S. v. Scarsdale Union Free School Dist.*, 826 F. Supp. 2d 635, 660 (S.D.N.Y. 2011) (quoting *A.P.*, 572 F. Supp. 2d at 225). Plaintiff references a child find obligation in the context of IDEA once in its reply brief (and not at all in its moving brief). Even if the argument were raised properly, it would fail because K.B. was not disabled for purposes of IDEA and it does not appear that the District "suspected" that she was so disabled. Moreover, even to the extent K.B. did have any struggles in school, "Child Find does not demand that schools conduct a formal evaluation of every struggling student." *Mr. P. v. W. Hartford Bd. of Educ.*, 885 F.3d 735, 749 (2d Cir. 2018).

[18] Plaintiffs' additional argument that "Defendant's *motion and responsive papers* [in this litigation] continue Defendant's deliberate indifference to Plaintiffs' requests for consideration of K.B.'s eligibility under Section 504 and IDEA" (emphasis added) similarly holds no weight. The District and its attorneys' presentations in front of this Court have, in no way shape or form, constituted discrimination against K.B. Moreover, these presentations clearly fall within the litigation privilege, which protects "[s]tatements made by parties, attorneys, and witnesses in the course of a judicial or quasi-judicial proceeding . . . notwithstanding the motive with which they are made, so long as they are material and pertinent to the issue to be resolved in the proceeding." *Black v. Ganieva*, No. 21-CV-08824, 2022 WL 2354916, at *23 (S.D.N.Y. June 30, 2022) (quoting *Officemax Inc. v. Cinotti*, 966 F. Supp. 2d 74, 79 (E.D.N.Y. 2013)).

gross misjudgment, or deliberate indifference. Defendant may have had any number of lawful reasons for its decision to not evaluate K.B. for a Section 504 plan, including its belief that K.B. did not need one given her academic results and teacher reviews, or that *ad hoc* interventions such as AIS math tutoring in sixth grade had been effective. Section 504 "does not require a public school district to provide students with disabilities with potential maximizing educations, only reasonable accommodations that give those students the same access to the benefits of a public education as all other students." *J.D. ex rel. J.D.*, 224 F.3d at 71.

In sum, "Plaintiffs['] Rehabilitation Act claims are, in actuality, merely restatements of their IDEA claims—that Defendant failed to appropriately classify [the child]. Summary judgment is therefore appropriate." *Maus*, 688 F. Supp. 2d at 302 (citing *Pinn*, 473 F. Supp. 2d at 484). Because there is no indication in the undisputed record that Defendant acted with deliberate indifference, bad faith, or gross misjudgment with respect to K.B., Defendant is entitled to judgment as a matter of law dismissing Plaintiffs' Section 504 claim.

## **CONCLUSION**

In light of the foregoing, Defendants' motion for summary judgment is GRANTED and Plaintiffs' motion for summary judgment is DENIED.

The Clerk of the Court is respectfully directed to: (i) terminate the motion sequences pending at Docs. 20 and 21; and (ii) close this case.

**SO ORDERED**:

Dated: White Plains, New York
      September 12, 2022

_____
Philip M. Halpern
United States District Judge